## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **MICHAEL BENSON,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:20-CV-1974-E-BH** |
| | § | |
| **ANDREW SAUL,** | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge**[1] |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Michael Benson (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for supplemental security income (SSI) under Title XVI of the Social Security Act (docs. 3, 21). Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **AFFIRMED**.

## I.      BACKGROUND

On August 30, 2017, Plaintiff filed his application for SSI, alleging disability beginning on October 11, 2015. (doc. 18-1 at 159, 211.)[2] His claim was denied initially on November 16, 2017, and upon reconsideration on January 22, 2018. (*Id.* at 17, 109.) On February 5, 2018, Plaintiff requested a hearing before an Administrative Law Judge (ALJ), and he personally appeared and testified at a hearing on December 18, 2018. (*Id.* at 17, 38-56.) After the hearing, he was sent for a consultative evaluation, and he subsequently appeared and testified at a hearing on September 23, 2019. (*Id.* at 64.) On October 29, 2019, the ALJ issued a decision finding him not disabled.

---

[1] By *Special Order 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

(*Id.* at 5, 14.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on November 12, 2019. (*Id.* at 11, 210.) The Appeals Council denied his request for review on June 10, 2020, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 5.) He timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (doc. 3.)

## A.  Age, Education, and Work Experience

Plaintiff was born on June 22, 1981; he was 37 years old at the time of the first hearing and 38 years old at the time of the second hearing. (doc. 18-1 at 26, 38, 56-57, 254.)  He graduated from high school, studied automotive technology, and was able to communicate in English. (*Id.* at 26.) He had past relevant work as an oiler. (*Id.* at 39, 42, 56-57, 69, 260-62, 521.)

## B.  Medical, Psychological, and Psychiatric Evidence[3]

On September 11, 2017, Plaintiff was admitted to Bluitt Flowers Geriatrics (Bluitt Flowers), a clinic of Parkland Hospital (Parkland), for anxiety, chest pain, knee pain, a skin problem, and sporadic headaches. (*Id.* at 376-84.) He reported seeing "ghostly shadows," losing loved ones within a short span of time, and having nightmares as a child. (*Id.* at 405-06.) On examination, he was oriented times four and presented with anxious mood and "rapid and/or pressured" speech. (*Id.* at 379, 405-08.) He was examined by Edith A. Hawkins-Frost, PA-C (PA-C), who referred him to behavioral health services. (*Id.* at 406-08.)

On September 21, 2017, in a behavioral health telephone call with Rushina Harishkumar Bhatt, Ph.D., Plaintiff complained of headaches and visual hallucinations. (*Id.* at 404-05.) On

---

[3] As discussed more fully below, Plaintiff did not specifically identify any issue in his two-page handwritten brief. (*See* doc. 21.) Because his arguments appear to focus on his mental impairments, only psychological and psychiatric evidence is recited.

examination, he was cooperative, alert, and oriented times four, and presented with intact abstract, normal attention, anxious mood, and impaired judgment; he denied suicidal or homicidal ideation. (*Id.* at 405.) Dr. Bhatt recommended a comprehensive psychological assessment. (*Id.*)

On November 16, 2017, Plaintiff was described by Umera Ghouse, M.D., at Parkland, as alert times four, with normal mood and affect, and not in distress, after he presented with elbow pain. (*Id.* at 447.)

Also on November 16, 2017, State Agency Medical Consultant (SAMC) Richard Alexander, M.D., completed a psychiatric review technique (PRT) assessment and found that Plaintiff had mild difficulties in understanding, remembering, or applying information, and mild difficulties in maintaining concentration, persistence, and pace. (*Id.* at 76.) He noted that Plaintiff reported anxiety and "memory difficulty"; not handling stress well but "doing alright with changes in routine"; and not following written instructions well but following spoken ones "somewhat well." (*Id.* at 76.) The SAMC opined that Plaintiff had non-severe anxiety and obsessive-compulsive disorders, and that while he might "be somewhat limited by symptoms," the overall impact of those symptoms did "not wholly compromise [his] ability to function independently, appropriately [and] effectively on a sustained basis." (*Id.* at 75-76.)

On November 20, 2017, after a referral from Bluitt Flowers, Plaintiff presented to Dallas Metrocare Services (Metrocare), where he was seen by an Advanced Practice Nurse (APN), Anitha Sunil (APN Sunil), for an initial psychiatric diagnostic evaluation. (*Id.* at 431-32.) Plaintiff denied past psychiatric illness but reported worsening depressive symptoms after having a heart attack in June 2017. (*Id.* at 431.) APN Sunil noted that Plaintiff had previously been diagnosed with major depressive disorder and was prescribed Remeron and Trazadone in 2004. (*Id.*) He said he felt sad

and hopeless, and reported amotivation, anergia, excessive anxiety, anger spells, irritability, problems with concentration, insomnia, a depressed mood, paranoia, and visual and non-commanding auditory hallucinations. (*Id.*) He also reported that unemployment and family conflict were current stressors, and that he had been sexually abused when he was 4 to 6 years old, and physically abused when he was 9 to 12 years old. (*Id.* at 431-32.) He denied suicidal or homicidal ideation. (*Id.*) On mental status examination, Plaintiff was cooperative, adequately groomed, and oriented times four, with normal psychomotor, organized thought processes and fair insight, judgment, and impulse control, but paranoid with impaired attention and reported psychosis. (*Id.* at 431-32.) APN Sunil diagnosed him with major depressive disorder and noted his medications as including Ibuprofen, Metroprolol, Tramadol, Protonix, and Sucralfate. (*Id.* at 431, 438.)

On December 14, 2017, Plaintiff presented to Bluitt Flowers with chief complaints of memory loss since June 2017, chest pain, heart palpitation, and knee pain, and he reported increased stressors. (*Id.* at 448, 450, 454.) On examination, he was alert, oriented times four, and had normal mood and affect, but he was "nervous/anxious". (*Id.* at 452-53.) The PA-C noted that because his heart studies were normal, his chest pain was not caused by his heart, and other causes such as stomach-acid reflux or lung or muscle issues should be considered, but his palpitation, headaches and chest pain was likely caused by his anxiety. (*Id.* at 453.) He was advised to continue taking Ibuprofen for diffusely scattered arthritis pain and given a psychological referral. (*Id.*) Plaintiff did not attend his follow-up appointment on December 19, 2017, and it was rescheduled. (*Id.* at 436-37.)

On December 28, 2017, he presented to APN Sunil at Metrocare for a medication refill and

follow-up appointment.[4] (*Id.* at 87, 437-43.) He reported that he had stopped taking Zoloft because it made him itchy, and he was started on Prozac for depression, Risperdal for psychosis, and Hydroxyzine for anxiety. (*Id.* at 442-43.) On examination, he was adequately groomed, cooperative, alert, oriented times four, with intact recent and remote memory, logical thought content, impaired attention/concentration, depressed mood, and fair judgment, insight and impulse control. (*Id.* at 87, 438-43.) He denied homicidal or suicidal ideation. (*Id.* at 440.) He was scheduled for a follow-up in four weeks. (*Id.* at 442.)

On January 22, 2018, SAMC Susan Posey, PsyD., completed a PRT for Plaintiff. (*Id.* at 17, 87-89, 109.) She generally affirmed Dr. Alexander's PRT assessment of him on grounds that it was "both supported by the objective findings and consistent across the available sources" and that his limitations imposed no more than a non-severe impact functioning "at this time," but based on additional medical evidence of record from Metrocare, she opined that Plaintiff also had a non-severe depressive, bipolar, and related disorder. (*Id.* at 88.)

On January 26, 2018, Plaintiff did not show for a follow-up appointment at Metrocare. (Id. at 490.) Days later, on February 1, 2018, he presented to APN Sunil at Metrocare for a follow-up appointment and requested food stamp assistance. (*Id.* at 491.) The next day, she completed a Medical Release/Physician's Statement, in which she noted "major depressive disorder" as the "primary/disabling diagnosis" and marked a box which stated that Plaintiff's "disability is not permanent and is expected to last 6 months or less." (*Id.* at 515-16.)

Between March 2, 2018, and March 29, 2018, Plaintiff's follow-up appointments at Metrocare were rescheduled three times. (*Id.* at 493-95.) On April 3, 2018, he presented to

---

[4] It is unclear from the record when Plaintiff was first prescribed Zoloft.

Metrocare for a Mental Health Living Environment Safety Screening; he reported being homeless and was described as wearing dirty clothing. (*Id.* at 496-98.) On May 2, 2018, he did not attend a follow-up appointment at Metrocare. (*Id.* at 499.)

More than four months after his last appointment at Metrocare, on July 18, 2018, he presented there for a medication refill, a health screening, and an Adult Needs and Strengths Assessment (ANSA). (*Id.* at 500-08.) He was examined by an APN Sunil who noted his paranoia, visual and auditory hallucinations, and described his diagnosis as worsening. (*Id.* at 606-09.) On examination, Plaintiff was adequately groomed and had normal psychomotor appearance, logical thought content, intact recent and remote memory, and fair judgment, insight, and impulse control, with limited attention/concentration and a depressed mood. (*Id.* at 605-07.) His strengths were listed as cognitively intact and seeking treatment, but his weaknesses included unemployment and poor coping skills. (*Id.* at 607, 609.) He refused Risperidone and Hydroxyzine, and was continued on Prozac for depression, Perphenazine for psychosis, Gabepentin for anxiety, Trazodone for sleep. (*Id.* at 608.) He was scheduled for a follow-up in four weeks. (*Id.*)

On August 15, 2018, Plaintiff presented to APN Sunil at Metrocare for a follow-up appointment. (*Id.* at 610-15.) He reported anger, increasing irritability and forgetfulness, paranoia and non-command visual and auditory hallucinations, fear of losing his job due to poor performance, and medication noncompliance because he was afraid it would make him sleepy at work. (*Id.* at 610.) He denied racing thoughts or homicidal or suicidal ideation. (*Id.*) On examination, he was described as cooperative and adequately groomed, with normal psychomotor appearance, logical thought content, and organized thought process. (*Id.* at 611-12.) The same day, APN Sunil provided a treating source statement, in which she noted Plaintiff's treatment since

November 20, 2017, opined that he suffered from major depressive disorder, and listed his current medications as Prozac, Perphenazine, Gabapentin, and Tradone. (*Id.* at 509.)

On September 12, 2018, and October 17, 2018, Plaintiff returned to APN Sunil at Metrocare for follow-up appointments and/or medication refills. (*Id.* at 616-27, 1058-63.) On both occasions, his chief complaints were worsening symptoms, increasing irritability, and anger spells, including inability to concentrate and more forgetfulness since his heart attack the year before. (*Id.*) On both dates, he was alert and oriented times four. (*Id.*) He reported non-command auditory and visual hallucinations and denied homicidal or suicidal ideation, racing thoughts, or flight of ideas, and he presented with normal psychomotor appearance, logical and organized thought content, fair judgment, insight, and impulse control, and impaired attention. (*Id.*) His prescriptions of Prozac for depression and Trazadone for sleep were extended; during the second visit, his dosage of Geodon for psychosis and Gabapentin for anxiety were increased. (*Id.* at 1056, 1062.)

On October 24, 2018, Plaintiff presented to Muralidhar Kannan, M.D., at Metrocare for an unscheduled visit, chiefly complaining that his bipolar, anxiety, and insomnia symptoms had been getting worse in the last month. (*Id.* at 628-34.) He reported poor sleeping and eating, worsening depression, angina, and mood swings, and getting easily irritable and angry. (*Id.* at 629.) He also reported not being able to keep a job, getting fired from his job the week before, looking for a job, and worrying that he would not be able to get another job "because of his temper issues." (*Id.* at 629.) He denied seizures, headaches, or suicidal or homicidal ideation. (*Id.*) Dr. Kannan discussed treatment options with him, and Plaintiff agreed to an increase in dosage of Gabapentin, Geodon, and Trazodone; his Prozac prescription was continued. (*Id.*) Dr. Kannan noted Plaintiff's response that his symptoms were worsening despite his medication. (*Id.* at 630.) On examination, he

appeared adequately groomed, alert, oriented times four, with normal psychomotor appearance, intact recent and remote memory, logical thought content, organized thought process, fair judgment, insight, and impulse content, and impaired attention/concentration, and he presented with irritable mood and restricted affect. (*Id.* at 630-32.) Plaintiff was scheduled for a follow-up appointment in two months. (*Id.* at 633.)[5]

More than four months later, on March 13, 2019, Plaintiff returned to Metrocare and presented to a clinician for a walk-in visit and medication refill; he explained he forgot his missed appointment. (*Id.* at 635-36.) He complained of problems with concentration, low energy and attention span, worsening depression, low motivation, difficulty sleeping, and worsening of symptoms since he was off his medication. (*Id.* at 635.) He reported feelings of hopelessness and worthlessness, and increasing irritability, agitation, and anger. (*Id.* at 635.) On examination, he was adequately groomed, cooperative, alert, oriented times four, and presented with fair judgment, insight and impulse control, intact computation, logical thought content, organized thought association, and intact recent and remote memory; he also presented with anxious, irritable, and depressed mood/affect. (*Id.* at 635.) Prescription orders of Gabapentin, Geodon, Prozac, and Trazadone were made during his visit. (*Id.* at 635-36.)[6]

On April 10, 2019, Plaintiff presented to APN Sunil at Metrocare for a follow-up appointment. (*Id.* at 637-39, 1042-44.) He reported amotivation, anergia, and forgetfulness, and he complained of a depressed mood that had worsened since his last visit, as well as increasing

---

[5] In the history of present illness section, Dr. Kanna noted that Plaintiff "denies auditory and visual hallucinations", but he noted that Plaintiff "reports psychosis, non-commanding hallucinations: auditory; visual" in the mental status exam section. (*Id.* at 629.)

[6] The clinician noted that Plaintiff "denies auditory and visual hallucinations" in the history of present illness section, but noted that Plaintiff "reports psychosis, non-commanding hallucinations: auditory; visual" in the mental status exam section. (*Id.* at 635.)

anxiety/excessive worries "causing dysfunction in carrying on daily routines." (*Id.*) Plaintiff denied suicidal or homicidal ideation and auditory or visual hallucinations. (*Id.*) His mental status examination remained unchanged from the last visit, except he had poor judgment. (*Id.*) His medication prescriptions also remained unchanged, except his Prozac dosage for mood had increased. (*Id.* at 638.) On June 3, 2019, he presented to Parkland for medication refill. (*Id.* at 578.)

On June 4, 2019, Plaintiff was voluntarily admitted for stabilization at Medical City Green Oaks Hospital (Green Oaks) for homicidal and suicidal ideation. (*Id.* at 720-841.) He underwent a psychiatric evaluation the next day and was found to be at acute risk because he had a plan with lethality. (*Id.* at 889-93.) Plaintiff was described as calm and cooperative, and he reported auditory and visual hallucinations. (*Id.* at 752.) On June 8, 2019, Brandy Gallien, M.D., restarted him on Seroquel and Gabapentin. (*Id.* at 758.)  The same day, Khoa D. Nguyen, DO, discharged him in stable condition, and scheduled him for a follow-up with Metrocare for medication management and/or counseling services. (*Id.* at 759, 763, 958.)

On July 19, 2019, Plaintiff presented to a clinician at Metrocare for a follow-up visit. (*Id.* at 1045-47.) He reported having "a lot of anxiety" and expressed the desire to continue the hospital discharge medications because they were effective. (*Id.* at 1045.) He also reported auditory and visual hallucinations, increasing irritability, agitation and anger, nightmares, racing thoughts, and flight of ideas. (*Id.*) On examination, he was adequately groomed, alert, oriented times four, with logical thought control, intact computation, organized thought association, intact recent and remote memory, and fair judgment, insight, and impulse control, although he presented with irritable and anxious mood and congruent affect. (*Id.*)

On August 9, 2019, Plaintiff presented to an APN Sunil at Metrocare for a follow-up visit.

(*Id.* at 1048-49.) He reported increasing depression and anxiety, poor sleep, auditory and visual hallucinations, increasing irritability, agitation and anger, problems with concentration, and racing thoughts. (*Id.* at 1048.) He endorsed auditory and visual hallucinations. (*Id.*) On examination, he presented as adequately groomed, alert, and oriented times four; paranoid with anxious, irritable, depressed mood; fair judgment and insight fair; intact computation and recent and remote memory; and organized thought association. (*Id.*) His medications included Trazodone, Prozac, Vistaril, Gabapentin, and Geodon. (*Id.* at 1049.)

On September 4, 2019, Plaintiff voluntarily returned to Green Oaks for homicidal ideation "towards anyone who 'triggers me'"; he denied suicidal ideation. (*Id.* at 644-719.) He reported homelessness, a history of PTSD, auditory and visual command hallucinations, conversations with himself, feeling more irritable, depressed, isolated, and "just having violent homicidal thoughts." (*Id.* at 667, 675.) On examination, he presented organized, linear, and bizarre thought content; not intact short term or long-term memory; limited/poor attention, concentration, insight, and judgment; limited intellect; and poor fund of knowledge. (*Id.* at 669, 675.) He was discharged the same day in stable condition because he did not want to miss pending medical appointments with a psychiatric follow-up appointment and referrals for substance abuse counseling. (*Id.* at 670-71, 677.) His medications were listed as Gabapentin, Metropolol, Nystatin, Seroquel, Pantoprazole, Trazadone, Hydrocortisone, Valium, Carafate, Geodon, Prozac, and Vistaril. (*Id.* at 675.)

## C.  Psychological Evaluation

On April 2, 2019, Plaintiff presented to Christina Ryser, Ph.D., for a psychological evaluation. (doc. 18-1 at 517-24.) He described his chief complaints as "bipolar, anxiety, paranoia," "anger management, moody," and forgetfulness. (*Id.* at 517.) Dr. Ryser noted that no

medical records were provided for review, but that Plaintiff appeared to be truthful and gave enough information to provide an accurate assessment of history and present functioning. (*Id.*) He described times of sadness, crying spells, psychomotor retardation, indecisiveness, difficulty concentrating, and "different mood states, during which he experience[d] abnormally and persistently angry mood, as well as increased goal-directed activity/energy." (*Id.* at 517-18.) Plaintiff stated that he had a "decreased need for sleep" and sometimes hated to sleep because of nightmares. (*Id.*) He described intense anxiety episodes during which he experienced palpitations, sweating, trembling, shaking, shortness of breath, chest pain, nausea, and fearing that he was dying. (*Id.*) He also described his attention and concentration as "terrible." (*Id.* at 520.)

Dr. Ryser noted that Plaintiff was cooperative and appropriately talkative, but his grooming and hygiene appeared poor, and he fidgeted in his seat throughout the session. (*Id.* at 521-22.) His facial expressions and tone of voice indicated a depressed and irritable/anxious affect. (*Id.* at 522.) He was unable to interpret simple proverbs. (*Id.*) Plaintiff denied any current suicidal ideation or plans for self-harm, did not appear confused, and was oriented to time, place, person, and situation. (*Id.*) He named something that orbited the Earth and knew who Benjamin Franklin was, but did not know on what continent the Swiss Alps were located, and he named only four cities when he asked to name five major cities. (*Id.* at 522-23.)

Plaintiff recalled Dr. Ryser's first name and repeated 4 words immediately after hearing them and remembered three words after a 5-minute delay with prompts, but was unable to remember 1 out of 3 words after another 5-minute delay. (*Id.*) Plaintiff could not do serial sevens or spell "world" backwards; he spelled "world" as "w-a-r-l-d." (*Id.*) He missed 4 out of 4 simple problems in addition, subtraction, multiplication, and division, and 3 out of 3 word problems

involving the same types of arithmetic skills, presented orally, although he self-corrected one of these mistakes. (*Id.*) During both simple and complex problems, he required multiple lengthy pauses and repetition to calculate an answer. (*Id.*)

Dr. Ryser opined that Plaintiff exhibited "fair judgment and insight" but "somewhat limited memory skills," "limited concentration skills," and "poor" abstract thinking and vocabulary skills." (*Id.* at 522-23.) She diagnosed him with bipolar I disorder (most recent episode depressed, severe with psychotic features, with mixed features, and with anxious distress) and panic disorder. (*Id.* at 523.) She noted that his psychiatric prognosis was poor without consistent treatment, that it might also be dependent in part on his physical health, and that his symptoms (e.g., mood swings, intense anxiety episodes, paranoia, hallucinations) were "likely to become exacerbated in times of stress/challenge." (*Id.* at 524.) Her assessment of Plaintiff's functional capacity stated:

> The examinee appears challenged to consistently understand, remember, and apply information. He appears limited with the ability to learn, recall, and use information to perform work activities. While he may be able to follow some one- or two-step instructions to carry out a task, he is likely to struggle with detailed/complex instructions. He may also be challenged to use reason and judgment to make work-related decisions, depending upon his mental state at a given time. He appears limited to concentrate, persist, and maintain pace, with regards to focusing attention on work activities, and staying on task at a sustained rate. He is also likely to have difficulty with the ability to relate to and work with supervisors, coworkers, and the public on a consistent and independent basis—once again, depending upon his mental state at a given time. Overall, his mental disorders would keep him from regulating his emotions, controlling his behavior, and/or maintaining his well-being in a work setting, and he is likely to struggle in dealing with normal pressures in a competitive work setting.

(*Id.*)

### D. <u>December 18, 2018 Hearing</u>

On December 18, 2018, Plaintiff and a VE testified at a hearing before the ALJ. (doc. 18-1 at 34-61.) Plaintiff was represented by an attorney. (*Id.* at 36-37.)

12

1. *Plaintiff's Testimony*

Plaintiff testified that he had worked in the automotive and restaurant industries; he got fired from his job as an oiler because he messed up a client's car, and he left his position at Cracker Barrel over disagreements with new management. (*Id.* at 38-40, 42.) After he was incarcerated for a year in 2007, he worked with his father in remodeling/construction jobs and was paid in cash. (*Id.* at 38-39, 41).

After he started to have problems with hallucinations and was seeing "ghostly shadows," Plaintiff went to Metrocare. (*Id.* at 44-45.)[7] He was also having problems with depressive symptoms, increasing anxiety and irritability, and hearing his name called. (*Id.* at 45.) He was placed on Zoloft but had problems with it, so he was prescribed Prozac, Rispiradol and Hydroxyzine. (*Id.*) Plaintiff missed some medical appointments and was off his medication during the two to three months that he was homeless and did not have any money. (*Id.*) His Prozac was increased, and he was placed on Perphenazine, Gabapentin and Trazadone because he was still hearing things that were not there and having problems with sleep, increasing anxiety, and depression. (*Id.*)

At the time of the hearing, Plaintiff was living with his father and stepmother, both of whom worked full-time outside the home. (*Id.* at 44-45, 47.) He stayed in his bedroom while they were home, and sometimes helped with washing dishes or taking out the trash, and he prepared simple meals for himself. (*Id.* at 44, 54-55.) He slept six to seven hours a night "in pieces," because of trouble falling asleep and staying asleep. (*Id.*at 55.) He did not talk with anyone besides his father and mother. (*Id.* at 49.)

---

[7] Plaintiff had experienced nightmares as a child. (*Id.*)

*2. VE's Testimony*

The VE testified that she had reviewed Plaintiff's work history and determined that he had past relevant work as an oiler, DOT 915.687-018 (medium, unskilled, SVP of 4). (*Id.* at 56-57.)

The ALJ asked the VE to consider a hypothetical individual with the same age, education, and background as Plaintiff who could perform a full range of sedentary work but was limited to no more than frequent reaching, handling, and fingering; understanding, remembering and carrying out simple job instructions and using appropriate judgment to make simple work-related decisions; maintaining sufficient attention and concentration or perform simple repetitive tasks in adapting to only the routine changes which accompany simple unskilled work; and have no more than occasional contact with coworkers, the general public and supervisors. (*Id.* at 57.) The VE responded that this hypothetical individual could not perform Plaintiff's past relevant work. (*Id.*)

The ALJ then asked the VE if that hypothetical individual could perform any other work in the national and regional economy. (*Id.*) The VE responded that this hypothetical individual could perform the following jobs: table worker, DOT 739.687-182 (sedentary, unskilled, SVP of 2), with 16,200 jobs in the national economy; final assembler, DOT 713.687-018 (sedentary, unskilled, SVP of 2), with 16,600 jobs in the national economy; and addresser, DOT 209.587-010 (sedentary, unskilled, SVP of 2), with 19,300 jobs in the national economy and 4,900 in Texas. (*Id.* at 57-58.)

The ALJ asked the VE to consider a second hypothetical individual with the same limitations as the first, but who was limited to no more than occasional rather than frequent reaching, handling and fingering. (*Id.* at 58.) The VE testified that the second hypothetical individual would be limited to two jobs: call out operator, DOT 237.367-014 (sedentary, unskilled,

SVP of 2) with 14,900 jobs in the national economy; and surveillance system monitor, DOT 379.367-010 (sedentary, unskilled, SVP of 2) with 6,000 jobs in the national economy. (*Id.*)

The ALJ stated that he was ordering a consultative examination and adjourned the hearing. (*Id.* at 59-60.)

**E.  September 23, 2019 Hearing**

Plaintiff and a second VE testified at a hearing on September 23, 2019. (*Id.* at 64-71.) Plaintiff was represented by an attorney. (*Id*. at 65.)

The ALJ initially noted that he had ordered a consultative examination, but a psychological evaluation had been conducted instead. (*Id.*) Plaintiff's attorney explained that because DDS had trouble finding Plaintiff, he sent Plaintiff to Dr. Ryser.  (*Id.* at 66.)  Counsel agreed with the ALJ that the evaluation was very similar to a consultative examination and provided sufficient evidence for the ALJ to decide the case, and that the record was complete.  (*Id.*)

The ALJ restated his first hypothetical to the prior VE. (*Id.* at 67-68.)  The hypothetical individual had a sedentary RFC limited to simple and with only frequent reaching, handling, and fingering; understanding, remembering and carrying out simple job instructions using appropriate judgment to make simple work-related decisions; maintaining sufficient attention and concentration and perform simple repetitive tasks; adapting to only the routine changes which accompany simple unskilled work; and with no more than occasional contact with coworkers, the general public and supervisors.  (*Id.* at 67-68.)  That individual was limited to essentially three jobs.  (*Id.* at 68.)  The VE agreed that what the ALJ had stated sounded correct.  (*Id*.)

The ALJ then asked the second VE to consider a hypothetical individual limited "to sedentary work with the simple RFC [he had]  set forth just a minute ago, with only occasional

contact with coworkers, the general public and supervisors, and were to find that this was an individual that was limited to no more than occasional reaching, handling, and fingering." (*Id.* at 69.) The VE agreed that would result in "a pretty significant erosion of the sedentary occupational base down to the point that there might only be one or two jobs left. (*Id.*)

The ALJ asked the VE to consider a hypothetical individual of the same age, education, and work background as Plaintiff who could perform sedentary work but who could only frequently reach, handle, and finger; understand, remember and carry out simple job instructions; had significant limitations in using judgment to make simple work-related decisions; was limited in his ability to maintain sufficient attention and concentration to perform simple repetitive tasks to the extent to which he would be off task 15% or more of a normal hour; and might be likely to not respond well to instructions and criticisms from supervisors. (*Id.* at 70.) The VE agreed that this hypothetical individual "might be able to maintain a job but not be able to keep it." (*Id.*)

## F. **ALJ's Findings**

The ALJ issued a decision denying benefits on October 29, 2019. (*Id.* at 14.) At step one, he found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of August 30, 2017. (*Id.* at 19.) At step two, the ALJ found that he had the following severe impairments: osteoarthritis of the knees, disorders of the back, obesity, bipolar disorder, and posttraumatic stress disorder (PTSD). (*Id.*) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the social security regulations. (*Id.* at 20.)

Next, the ALJ determined that Plaintiff retained the RFC to perform sedentary work as defined in 20 C.F.R. § 416.967(a), with the following limitations: frequently reach, handle, and

finger; understand, remember, and carry out simple instructions and use appropriate judgment to make simple work related decisions; maintain sufficient attention and concentration to perform simple repetitive tasks and adapt to the routine changes that accompany simple unskilled work; and have no more than occasional contact with supervisors, co-workers, and the public. (*Id.* at 21.)

At step four, the ALJ determined that Plaintiff was unable to perform his past work. (*Id.* at 26.) At step five, the ALJ found that transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that he was not disabled regardless of whether he had transferable job skills, but considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could perform. (*Id.*) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from August 30, 2017, through the date of his decision. (*Id.* at 27.)

## II.    STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding

of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See Id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See Id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

18

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## III.    ISSUES FOR REVIEW

Plaintiff did not specifically identify any issue in his handwritten two-page brief. (*See* doc. 21.) He disagrees with the ALJ's characterization of the frequency with which he saw ghostly apparitions, complains about his attorney's performance, including his failure to explain the reasons for the gap in psychiatric treatment, and notes that his claim was denied despite being

evaluated as having "a mental issue" by several psychiatrists at MHMR and an "outside doctor." (*See id.*)[8] The Commissioner argues that by failing to identify any issues, Plaintiff has waived any intended arguments. (*See* doc. 22 at 1-2, 4-5.) In the alternative, he construed Plaintiff's brief as generally alleging that the ALJ should have found him disabled and also addressed the specific arguments regarding treatment non-compliance and attorney performance. (*See id.* at 2, 5-7.) Plaintiff's brief is therefore liberally construed as raising issues concerning his attorney's performance, the ALJ's consideration of the gap in his mental health treatment, and the weight the ALJ gave to the medical opinions. (doc. 21.)[9]

## A. **Attorney's Performance**

Plaintiff appears to claim that his attorney's performance resulted in the denial of his claim. (*See* doc. 21.)

In *Cornett v. Astrue*, 261 F. App'x 644, 651 (5th Cir. 2008), the United States Court of Appeals for the Fifth Circuit rejected a social security claimant's argument that he had been a victim of ineffective assistance of counsel at his hearing before the ALJ. Noting that "[t]he Supreme Court has never recognized a constitutional right to counsel in Social Security proceedings[,]" the Fifth Circuit found that the claim did not rise to the level of a constitutional violation and left the district court's decision to affirm the Commissioner's decision undisturbed. (*Id.* (citing *Brandyburg v. Sullivan*, 959 F.2d 555, 562 (5th Cir.1992)). District courts in this district

---

[8] The references to ghostly apparitions, the gap in psychiatric treatment, and the medical opinions appear in the ALJ's discussion regarding his RFC determination. (*See* doc. 18-1 at 22-23, 24-25.)

[9] *Pro se* briefs are liberally construed and interpreted under less stringent standards than the case of a counseled party. *See Harris v. Barnhart*, 204 F. App'x 447, 448 (5th Cir. 2006) (citing *Grant v. Cuellar*, 59 F.3d 523, 524 (5th Cir. 1995)).

and circuit have likewise rejected claims of ineffective counsel as a basis for reversing the Commissioner's denial of benefits. *See Johnson v. Astrue*; No. 3:10-CV-0246-D, 2010 4722275, at *3-4 (N.D. Tex. Nov. 22, 2010) (Fitzwater, C.J.) (noting the Fifth Circuit's holding that the right to effective assistance of counsel does not apply in civil proceedings, and that it has not adopted such a right in the social security context); *see also Firmature v. Soc. Sec. Admin.*, No. A-20-CV-0051-RP, 2020 WL 10316644, at *2 (W.D. Tex. Jan. 22, 2020) (specifically noting complaint about attorney's performance before the ALJ but pointing out that judicial review of the Commissioner's decision is limited to whether substantial evidence supports the decision, and whether the relevant legal standards were correctly applied); *Cole v. Comm'r of Soc. Sec.*, No. 2:09-CV-225-SAA, 2010 WL 3782445, at *5 (N.D. Miss. Sept. 20, 2010) (expressly rejecting ineffective assistance of counsel claim).[10]  Moreover, even if such a right existed, Plaintiff has not made the required showing of a sufficient egregiousness. *See id.* at *3-4 (citing *Arms v. Gardner*, 353 F.2d 197 (6th Cir. 1965)). The allegedly deficient performance by Plaintiff's attorney at the administrative level is not a basis for remand of this case.

---

[10] Other circuit courts have similarly found that an attorney's alleged ineffectiveness or malpractice is not grounds to reverse the Commissioner's decision; any such claims must be addressed in a separate proceeding.  *See Czupryna v. Comm'r of Soc. Sec.*, 782 F. App'x 835, 837 (11th Cir. 2019) (noting that it did not appear the district court would have had the authority to consider a claim that counsel rendered ineffective assistance during her administrative proceedings); *Rotolo v. Berryhill*, 741 F. App'x 851, 853–54 (2d Cir. 2018) (finding ineffective assistance of counsel claim in a civil case not cognizable, so complaints regarding counsel's performance had to be raised in a separate malpractice proceeding); *Winick v. Colvin*, 674 F. App'x 816, 819 (10th Cir. 2017) ("[t]he general rule in civil cases is that the ineffective assistance of counsel is not a basis for appeal or retrial") (internal quotations omitted); *Russell v. Chater*, 62 F.3d 1421, at *2 (8th Cir.1995) (ineffective assistance of counsel claim not cognizable in a Social Security appeal); *Slavin v. Comm'r*, 932 F.2d 598, 601 (7th Cir. 1991) ("[t]here is no principle of effective assistance of counsel in civil cases."); *but see Arms v. Gardner*, 353 F.2d 197 (6th Cir. 1965) (remanding where the claimant's attorney "took no part in the examination of witnesses, offered no testimony on appellee's behalf and gave the appellee no apparent legal assistance in the preparation of the case, admitting of the record that he knew very little about Social Security laws.").

### B.  Gaps in Treatment

Plaintiff complains that his attorney failed to explain that he missed psychiatric treatment because he lacked bus fare to attend appointments, and that he tried to reschedule the appointments but his messages and calls were not returned. (*See* doc. 21.)

"An ALJ is entitled to consider noncompliance with prescribed medical treatment as a factor in the overall disability determination." *Luzenia K. v. Saul*, No. 3:19-CV-01006-BT, 2020 WL 2574933, at *6 (N.D. Tex. May 20, 2020) (citations omitted); *see also Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990) ("A claimant's non-compliance with treatment is a proper factor for the ALJ to consider in assessing credibility."). Failure to follow prescribed treatment is relevant in determining whether disability exists and is an indication of nondisability. *See* 20 C.F.R. § 416.930; SSR 82-59, 1982 WL 31384, at *1 (S.S.A. 1982) ("Individuals with a *disabling impairment* which is amenable to treatment that could be expected to restore their ability to work must follow the prescribed treatment to be found under a disability, unless there is a justifiable cause for the failure to follow such treatment.") (emphasis original).

#### 1.    SSR 16-3p

Plaintiff's brief may be liberally construed as claiming that the ALJ violated Social Security Regulation (SSR) 16-3p when he failed to consider the possible reasons for why he was unable to comply with or seek treatment consistent with the degree of his complaints.

SSR 16-3p requires the ALJ to consider a plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms, which the ALJ must then consider in light of the objective medical evidence and other evidence in the record. *Anderson v. Berryhill*, No. 3:16-CV-0853-BK, 2017 WL 3589543, at *5 (N.D. Tex. Aug. 18, 2017).  It provides:

> [I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. We will not find an individuals symptoms inconsistent with the medical evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints. We may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints.

Soc. Sec. Admin., SSR 16–3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2016 WL 1119029 (Mar. 16, 2016).

Here, the ALJ reviewed the record as a whole, including the gap in treatment, and detailed the reasons for his conclusion. *See Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991) ("An ALJ has discretion to use a plaintiff's noncompliance with treatment in making a determination about Plaintiff's subjective complaints, as long as the ALJ's conclusions are supported by substantial medical evidence."). In addition to the gap in treatment, the ALJ found that Plaintiff had described activities of daily living inconsistent with a claim of disability. (*See* doc. 18-1 at 24.) He could manage his personal care, prepare his own meals, perform household chores, do his laundry, utilize public transportation, shop for groceries weekly, manage his finances, and attend church. (*Id.* at 22, 24.) For those reasons, he found that Plaintiff's allegations regarding the effects of his symptoms were not persuasive or consistent with the record as a whole. (*Id.* at 24.) The ALJ did not base his finding of not disabled solely on Plaintiff's noncompliance with treatment, but on the record as a whole, considering his noncompliance as a factor. *See Milligan v. Colvin*, No. 3:14-CV-868-L, 2014 WL 7028038, at *8 (N.D. Tex. Dec. 12, 2014) ("To the extent that the ALJ based his decision of non-disability on [the plaintiff's] non-compliance with prescribed treatment, that

23

was but one of many factors—including the objective medical evidence in the record and [the plaintiff's] lack of complaints, lack of shortness of breath, and improvement on medication—that the ALJ cited."). Moreover, he specifically noted reasons for the non-compliance, such as Plaintiff's testimony about being in and out of shelters. (*Id.* at 22, 23.)

*2. SSR 82-59*

Plaintiff's brief may also be liberally construed as arguing that the requirements of SSR 82-59 apply because the ALJ's ultimate finding that he was not disabled was based on the gap in mental health treatment.

Under SSR 82-59, "[a]n individual who would otherwise be found under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source which the Social Security Administration (SSA) determines can be expected to restore the individual's ability to work, cannot by virtue of such 'failure' be found to be under a disability." SSR 82-59, 1982 WL 31384, at *1.[11] Even though SSR 82-59 typically applies only after a finding that the claimant is disabled at step 5, the ALJ must adhere to its procedures if she relies "almost exclusively" on noncompliance with prescribed treatment to determine the claimant's RFC, and in ultimately

---

[11] Failure to follow prescribed treatment is an issue "only where all of the following conditions exist:"

1. The evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity (SGA) or, in the case of a disabled widow(er) that the impairment meets or equals the Listing of Impairments in Appendix 1 of Regulations No. 4, Subpart P; and
2. The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death; and
3. Treatment which is clearly expected to restore capacity to engage in any SGA (or gainful activity, as appropriate) has been prescribed by a treating source; and
4. The evidence of record discloses that there has been refusal to follow prescribed treatment.

SSR 82-59, 1982 WL 31384, at *1.

finding him not disabled. *See Lindsey v. Astrue*, No. 3:09-CV-1649-BF, 2011 WL 817173, at *8 (N.D. Tex. March 9, 2011) ("[T]he ALJ cannot circumvent the requirements of SSR 82-59 and §§ 404.1535 and 416.935 by couching her analysis of substance use and noncompliance in terms of an RFC determination."); *Simmons v. Berryhill*, No. 4:17-CV-684-A-BJ, 2018 WL 3900912, at *4 (N.D. Tex. July 31, 2018), *adopted by* 2018 WL 3873664 (N.D. Tex. Aug. 15, 2018) ("[I]f the ALJ's ultimate finding that a claimant was not disabled is based significantly on the ALJ's perception that the plaintiff's failure to follow a prescribed treatment caused the condition to be worse than it might otherwise be, then the requirements of SSR 82-59 apply."); *Busby v. Colvin*, No. CV H-15-2929, 2017 WL 818582, at *10-11 (S.D. Tex. Feb. 10, 2017), *adopted sub nom. by* 2017 WL 822123 (S.D. Tex. Feb. 28, 2017) ("If the ALJ bases the RFC or ultimate finding of disability on a claimant's noncompliance with treatment, whether explicitly or implicitly, then the ALJ must follow SSR 82-59.").  If the ALJ considers the claimant's noncompliance "in connection with assessing the claimant's credibility and in making a determination as to the severity of the claimant's alleged subjective symptoms, SSR 82-59 need not be mentioned or followed." *Fall v. Astrue*, No. CIV.A. H-12-0265, 2012 WL 6026438, at *10 (S.D. Tex. Dec. 4, 2012); *see Busby*, 2017 WL 818582, at *10-11 (finding SSR 82-59 inapplicable when "noncompliance with treatment was considered by the ALJ for the purposes of determining the plaintiff's credibility and severity of the plaintiff's symptoms"); *Johnson v. Comm'r of Soc. Sec. Admin.*, No. 3:11-CV-3126-L-BF, 2013 WL 632104, at *21 (N.D. Tex. Feb. 4, 2013) (explaining that the ALJ was not required to follow the requirements of SSR 82-59 because the ALJ "merely utilized [p]laintiff's noncompliance with prescribed treatment as a factor in assessing her credibility," and not in finding her not disabled).

25

Here, the ALJ determined that Plaintiff did not suffer from a disabling impairment and was not disabled. (*See* doc. 18-1.)  His noncompliance with prescribed treatment was one of many factors in the analysis of his mental limitations. (*See id.* at 22-25.)  The ALJ noted that during an initial evaluation, Plaintiff denied past psychiatric illness, and his mental examination showed he was cooperative, was adequately groomed, had organized thought processes, and had fair insight judgment and impulse control. (*Id.* at 23.) Routine mental status examinations showed that Plaintiff generally maintained intact memory, an average fund of knowledge, intact computation, and fair insight and judgment. (*Id.* at 25.) He performed many activities of daily living. (*Id.* at 22, 24.) After Plaintiff was hospitalized, he was administered medication and discharged in stable condition after a brief stay. (*Id.* at 23.) The ALJ therefore properly considered Plaintiff's noncompliance in evaluating whether his statements concerning the severity of his symptoms were consistent with the medical evidence and other evidence in the record. *See Fall*, 2012 WL 6026438, at *10; *Johnson*, 2013 WL 632104, at *21; *see, e.g., McNeil v. Colvin*, No. 4:12-CV-01628, 2013 WL 5785561, at *11-12 (S.D. Tex. Aug. 22, 2013), *adopted by* 2013 WL 12106137 (S.D. Tex. Sept. 25, 2013) ("[T]he ALJ permissibly considered McNeil's occasions of non-compliance in evaluating the credibility of McNeil's own testimony about the severity of his symptoms.").

Because the ALJ found Plaintiff was not disabled and did not rely solely on medical noncompliance for his decision, the requirements of SSR 82-59 did not apply. *See  Fall*, 2012 WL 6026438, at *10; *Johnson*, 2013 WL 632104, at *21; *see, e.g., Hawkins v. Astrue*, 2011 WL 1107205 *3 (N.D. Tex. 2011) ("Because the ALJ considered plaintiff's failure to take prescribed medications only in assessing her credibility, and not in determining whether she would be able to work had she followed her medication regime, the judge was not required to follow the procedures

set forth in 20 C.F.R. § 416.930 and SSR 82-59.").  Accordingly, the ALJ did not have a duty to

further develop the record by inquiring further into the reason for Plaintiff's past failure to follow

prescribed treatment.[12] *See Clark v. Astrue*, No. CIV.A. 4:12-0350, 2013 WL 105017, at *7 (S.D.

Tex. Jan. 8, 2013)(recognizing that "SSR 82-59 need not be followed when the ALJ considers the

claimant's non-compliance only in connection with the claimant's credibility and with the severity

of the claimant's subjective symptoms").  Remand is not required.

## C.  Medical Source Opinions

Plaintiff argues that he was denied disability even after several psychiatrists stated that

"there was a mental issue;" he specifically referenced MHMR, where he received treatment, as

well as an "outside doctor." (doc. 21 at 2.)  His argument is liberally construed as a challenge to

the weight given to the medical source opinions.

The Commissioner is entrusted to make determinations regarding disability, including

weighing inconsistent evidence. 20 C.F.R. § 404.1529.  Every medical opinion is evaluated

regardless of its source, but the Commissioner "will not defer or give any specific evidentiary

weight, including controlling weight, to any medical opinion(s) or prior administrative medical

---

[12] An ALJ has a duty to fully and fairly develop the facts relative to a claim for benefits. *Newton*, 209 F.3d at 458 (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)). When the ALJ fails in this duty, he does not have before him sufficient facts upon which to make an informed decision, and his decision is not supported by substantial evidence. *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (per curiam) ("When a claimant is not represented by counsel, the ALJ owes a heightened duty to 'scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts.'"); *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984). The ALJ's duty to develop the record "is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (5th Cir. 2001).  Here, Plaintiff was represented by counsel at the hearing, so no "heightened duty to scrupulously and conscientiously explore all relevant facts" arose. *Castillo v. Barnhart*, 325 F.3d 550, 552-53 (5th Cir. 2003) (per curiam); *see, e.g., Isbell v. Colvin*, No. 1:14-CV-006-C, 2015 WL 1208122, at *3 n.1 (N.D. Tex. Mar. 16, 2015) (noting that the ALJ did not have a heightened duty to develop the record where the claimant was represented by counsel).

finding(s), including those from [his] medical sources." *Id.* § 404.1520(a)(3), § 404.1520c(a).[13]  A

medical opinion is a statement from a medical source about what the claimant can still do despite

his impairment(s) and whether he has one or more impairment-related limitations or restrictions in

the following abilities:

> (i)     [his] ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
> (ii)    [his] ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;
> (iii)   [his] ability to perform other demands of work, such as seeing, hearing, or using other senses; and
> (iv)    [his] ability to adapt to environmental conditions, such as temperature extremes or fumes.

*Id.* § 404.1513(a)(2)(i)-(iv).

The guidelines provide that the ALJ will explain in his determination or decision how

persuasive he finds "all of the medical opinions and all of the prior administrative medical findings

in [the] case record." *Id.* § 416.920c(b).[14]   Five factors are considered in evaluating the

---

[13] On January 18, 2017, the Administration updated the rules on the evaluation of medical evidence. *See* 82 Fed. Reg. 5844, 5853 (Jan. 18, 2017).  For claims filed on or after March 27, 2017, the rule that treating sources be given controlling weight was eliminated. *See Winston v. Berryhill*, 755 F. App'x 395, 402 n.4 (5th Cir. 2018) (citing 20 C.F.R. § 404.1520c(a)) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)"). Plaintiff filed his application after the effective date, so the new 2017 regulations apply.

[14] When a medical source provides multiple medical opinions, the ALJ will articulate how he "considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors," but he is not required to articulate how he considered each medical opinion or prior administrative medical finding from one medical source individually. *Id.* at 20 C.F.R. § 416.920c(b)(1).

persuasiveness of the medical opinion(s): (1) supportability;[15] (2) consistency;[16] (3) relationship with the claimant;[17] (4) specialization; and (5) other factors which "tend[s] to support or contradict the opinion." *See id.* § 404.1520c(c)(1)-(5). The most important factors to consider when evaluating the persuasiveness of medical opinions and prior administrative medical findings are supportability and consistency. *See id.* § 404.1520c(a). The ALJ will "explain how [he] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [his] determination or decision." 20 C.F.R. § 404.1520c(b)(2). He may, but is not required to, explain how he considered the remaining factors. *Id.* at §§ 404.1520c(b)(2), 416.920c(b)(2). Although the ALJ evaluates the persuasiveness of the opinions when determining disability, the sole responsibility for a disability determination rests with the ALJ. *See Newton*, 209 F.3d at 455.

### 1. *Outside Doctor*[18]

The ALJ explained that he was "not persuaded" by the opinion of Dr. Ryser, who conducted a psychological evaluation on April 2, 2019. (*Id.* at 25.) Dr. Ryser opined that Plaintiff appeared challenged to consistently understand, remember, and apply information; appeared limited in ability to learn, recall, and use information to perform work activities; might be able to

---

[15] "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) ..., the more persuasive the medical opinions ... will be." 20 C.F.R. § 404.1520c(c)(1).

[16] "The more consistent a medical opinion(s) ... is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) ... will be." 20 C.F.R. § 404.1520c(c)(2).

[17] This factor combines consideration of the (i) length of treatment relationship; (ii) frequency of examinations; (iii) purpose of the treatment; (iv) extent of the treatment relationship; and (v) examining relationship.

[18] Plaintiff's reference to "an outside doctor" is liberally construed as a reference to Dr. Ryser, who conducted the psychological evaluation and concluded that his mental disorders would affect his ability to work.

follow some one-step or two-step instructions but was likely to struggle with detailed/complex instructions; might be challenged to use reason and judgment to make work-related decisions depending on his mental state at the time; appeared limited to concentrate, persist, and maintain pace with regards to focusing and staying on task at a sustained rate; and would likely have difficulty relating to and working with supervisors, coworkers and the public on a consistent and independent basis. (*Id.* at 25.) The ALJ noted Dr. Ryser's overall conclusion that Plaintiff's mental disorders would keep him from regulating his emotions, controlling his behavior and/or maintaining his well-being in a work setting, and that he was likely to struggle in dealing with normal pressures in a competitive work setting. (*Id.*)

The ALJ explained that while her opinion was "somewhat" supported by her findings, Dr. Ryser's "one time" examination was not reflective and was inconsistent with Plaintiff's longitudinal medical history of limited psychiatric treatment. (*Id.*) He specifically noted:

> [R]outine mental status examinations show that [Plaintiff] generally maintains intact memory, average fund of knowledge, and intact computation, inconsistent with significant deficits in understanding, remembering, and applying information. Moreover, [Plaintiff]'s insight and judgment have also generally been judged to be fair, indicative of a fair ability to use reason and judgment to make work-related decisions. … [Plaintiff] has also described activities of daily living, including reading for leisure, watching television, shopping in stores, preparing meals, and utilizing public transportation—activities that demonstrate some ability to interact appropriately with others as well as persist and concentrate[.]

(*Id.*) (internal citations to the medical evidence of record omitted). He agreed with her opinion that Plaintiff would have some difficulty maintaining concentration and relating to others because he presented at times with impaired concentration and an irritable/restricted affect. (*Id.*) The ALJ concluded that Dr. Ryser's opinion that Plaintiff would likely struggle in dealing with normal

pressures in a competitive work setting was inconsistent with his limited level of psychiatric treatment throughout the period at issue. (*Id.*)

Although the ALJ did not make a specific finding as to each of the factors in 20 C.F.R. §§ 404.1520c(c)(1)-(5), he expressly stated that he considered the opinion evidence and prior administrative medical findings, and he recited the language in § 404.1520c(a) regarding the weight to be given to them almost verbatim.  (*See id.* at 24.)  His decision reflects detailed consideration of supportability and consistency, the two most important factors in evaluating the persuasiveness of medical opinions. He specifically noted the inconsistency between Dr. Ryser's opinions and the medical record, finding that her opinions were "somewhat" supported.  *See Gentry v. Saul*, No. 3:19-CV-778, 2020 WL 5100848, at *8 (M.D. Tenn. Aug. 10, 2020), *report and recommendation adopted sub nom. Gentry v. Soc. Sec. Admin.*, No. 3:19-CV-00778, 2020 WL 5096952 (M.D. Tenn. Aug. 28, 2020) (finding that the ALJ properly evaluated the opinions of the plaintiff's treating physician where he specifically found that physician's opinion was not supported by his treatment records or the objective medical evidence and was inconsistent with the plaintiff's medical records). The ALJ also considered her relationship with Plaintiff, noting that she had only met him once for purposes of the psychological evaluation, and that it occurred "after months of treatment noncompliance."  (*Id.* at 23, 25.) Because the regulations require only that the ALJ "explain how [he] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [his] determination or decision," he properly evaluated Dr. Ryser's medical opinion. 20 C.F.R. § 404.1520c(b)(2).

31

2. *Metrocare (formerly known as MHMR)*[19]

The ALJ also explained that he was not persuaded by the Medical Release/Physician's Statement of APN Sunil at Metrocare, which stated that Plaintiff was disabled but not permanently. (*Id.* at 25.) The ALJ specifically noted that the statement failed to include a function-by-function assessment of Plaintiff's limitations, and that it was neither inherently valuable nor persuasive, because the disability determination is an issue reserved for the Commissioner. (*Id.*)

As noted, the medical source statement at issue was a brief and conclusory check-box form that did not include any explanatory notes or supporting tests or examinations. (*See id.* at 515-16.) Prior to the new regulations, the Fifth Circuit recognized that opinions of treating physicians are not entitled to considerable weight when they are brief and conclusory and lack explanatory notes or supporting objective tests and examinations. *See Heck v. Colvin*, 674 F. App'x 411, 415 (5th Cir. 2017); *Foster v. Astrue*, 410 F. App'x 831, 833 (5th Cir. 2011). The ALJ's reasons for finding the check-box form unpersuasive goes to the supportability of APN Sunil's opinion. *See Cherrell Carson Footman, v. Andrew M. Saul, Comm'r of Soc. Sec.*, No. 1:19CV1200, 2020 WL 6728937, at *11 (M.D.N.C. Nov. 16, 2020) (finding that the language in the ALJ's discussion makes clear that her "analysis comports with the new regulations, as she properly considered the supportability and consistency of [the nurse practitioner's] opinions, as well as disregarded [her] opinion that [the] [p]laintiff lacked the ability to work as a matter reserved to the Commissioner.").

---

[19] "Dallas Metrocare Services was formerly known as the Dallas County Mental Health and Mental Retardation (MHMR) Center." *Johnson v. Astrue*, No. 3-08-CV-1488-BD, 2010 WL 26469, at *3 n. 1 (N.D. Tex. Jan. 10, 2010); *see also* www.metrocareservices.org, last visited Mar. 7, 2022 ("the center was established in 1967 as Dallas County MHMR").

In conclusion, the ALJ properly considered Dr. Ryser's and APN Sunil's opinions, and his RFC determination was based on the medical evidence in the record, so his RFC determination is supported by substantial evidence. *See Swingle v. Comm'r of Soc. Sec. Admin.*, No. 6:20-CV-365-ORL-MCR, 2020 WL 6708023, at *5 (M.D. Fla. Nov. 16, 2020) (finding that the ALJ properly addressed the supportability and consistency factors and because his RFC determination was based on medical evidence in record, it was supported by substantial evidence). Remand is not warranted on this basis.

## IV.        RECOMMENDATION

The Commissioner's decision should be **AFFIRMED**.

**SO RECOMMENDED** on this 8th day of March, 2022.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## <u>NOTICE OF RIGHT TO APPEAL/OBJECT</u>

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

34